# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| JOSEPH L. BLACKWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 2:12cv0058 RWS |
| | ) | TCM |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Joseph Blackwell for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b.[1]

Mr. Blackwell has filed a brief in support of his complaint; the Commissioner has filed a brief in support of her answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

---

[1]Mr. Blackwell originally also applied for disability insurance benefits (DIB) under Title II of the Act, 42 U.S.C. § 401-433. He dismissed this application at the beginning of the hearing after amending his alleged disability onset date to June 26, 2008, a date approximately two years after the date – June 30, 2006 – he was last insured for purposes of Title II. Consequently, although he filed two applications, the Court will refer only to his SSI application.

**Procedural History**

Joseph Blackwell (Plaintiff) applied for SSI in September 2009, alleging he had become disabled on December 31, 2003, by explosive disorder, bipolar disorder, schizophrenia, kidney problems, and problems with his left shoulder.  (R.[2] at 96-104, 143.) His application was denied initially and following a video conference hearing held in June 2011 before Administrative Law Judge (ALJ) Martha R. Reeves.  (Id. at 22-39, 44-74.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

**Testimony Before the ALJ**

Plaintiff, represented by counsel, and Amy Kutschbach, M.R.C.,[3] C.R.C.,[4] testified at the administrative hearing.

At the beginning of the hearing, Plaintiff amended his alleged disability onset date to be the date he last worked, July 26, 2008.  (Id. at 46.)  That was the day he was fired.  (Id. at 47.)  He applied for unemployment benefits, but was denied.  (Id.)  He did not appeal the denial.  (Id.)  Since he was fired, he and his wife live on her earnings from Walmart.  (Id. at 48.)  He was thirty-three years old at the time of the hearing, is married, and has two

_____

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

[3]Masters of Rehabilitation Counseling.

[4]Certified Rehabilitation Counselor.

- 2 -

children, ages ten and eight.  (Id. at 51-52.)  He, his wife, and his children live in a house. (Id. at 52.)  He is 6 feet 2 inches tall and weighs 310 pounds.  (Id.)  He is right-handed.  (Id.)

Plaintiff also testified that he quit his last job because of verbal abuse from his supervisors.  (Id. at 48-49.)  He had worked as a laborer.  (Id. at 49.)  At every job he had, the supervisor did not like his work.  (Id. at 49.)  He explained that he walked away from his last job after he picked up a sledge hammer when feeling threatened by his supervisor, who acted like he wanted to harm Plaintiff.  (Id. at 52-53.)  Plaintiff frequently feels like people are going to harm him.  (Id. at 53.)  He is told so by voices in his head.  (Id.)

Plaintiff is taking Depakote[5] for blackouts and bipolar disorder and risperidone[6] and trazodone[7] to help him sleep.  (Id. at 54.)  His blackouts last three to five minutes.  (Id. at 55.) He does not remember what he does during a blackout, but is told by observers that he walks off and talks to himself.  (Id.)  Because of the blackouts, he restricts himself to driving one hour a day.  (Id. at 58-59.)  He does not recall ever having a blackout when he is driving.  (Id. at 59.)

Three to five times a week, he has problems with day-long dizziness.  (Id. at 55-56.) He takes over-the-counter motion sickness medication for the dizziness; it helps "a little bit." (Id. at 56.)  When he is dizzy, he wobbles and stumbles around.  (Id.)

---

[5]Depakote is prescribed for the "[a]cute treatment of manic or mixed episodes associated with bipolar disorder, with or without psychotic features."  Physicians' Desk Reference, 425 (65th ed. 2011) (PDR).

[6]Risperidone (brand name is Risperdal) is prescribed for the treatment of schizophrenia.  Id. at 2741.

[7]Trazodone is prescribed for the treatment of major depressive disorder.  Id. at 3446.

Plaintiff has anger problems.  (Id. at 57.)  Voices in his head tell him to get angry.  (Id.)  They tell him that people are trying to harm him and that he should assault them.  (Id.)  People staring at him, harassing him, and saying mean things to him make him angry.  (Id. at 57-58.)

Plaintiff has an intelligence quotient (IQ) of 75.  (Id. at 49.)  He was in special education and graduated from high school.  (Id. at 49, 50.)

In addition to working construction, Plaintiff has worked in a kitchen washing pots and pans.  (Id. at 59.)  This job was without pay.  (Id. at 60.)

Ms. Kutschbach testified without objection as a vocational expert (VE).  (Id. at 59.)  She was asked by the ALJ to assume a hypothetical claimant of Plaintiff's age and education whose concentration is impaired to such a degree that he is off task one-third to two-thirds of the time; his social functioning is impaired to such a degree that he can not moderate his relationships with coworkers and supervisors one-third to two-thirds of the time; and his persistence is such that he can complete tasks only one-third of the time.  (Id. at 60.)  Also, he has blackouts four to five times a week that last two to three minutes.  (Id.)  The VE testified that such a claimant can not perform Plaintiff's past work or any other work.  (Id. at 61.)  If this claimant has no blackouts but has the other restrictions, there is still no work he can perform.  (Id. at 62.)

If this hypothetical claimant can do simple, unskilled routine tasks requiring only limited interaction with the public, coworkers, or supervisors and can perform work at the

medium exertional level,[8] the VE testified that the claimant can perform Plaintiff's past work as he described it.  (Id. at 61.)  If this claimant requires "very minimal work associations with coworkers or supervisors," he can work as a floor waxer.  (Id.)  This position, *Dictionary of Occupational Titles* (DOT) 381.687-343, was medium, unskilled, and exists in significant numbers in the national and state levels.  (Id.)  It is "primarily done alone or without anyone around."  (Id.)  A job as a kitchen helper, similar to that performed by Plaintiff when in prison, "would also be somewhat solitary," but would involve "some very incidental interaction with coworkers . . . ."  (Id. at 62.)  That position, DOT 318.687-010, is medium, unskilled, and exists in significant numbers in the state and national economies.  (Id.)

The jobs of floor waxer and kitchen helper require the worker to meet the supervisor's standards.  (Id. at 63.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and various assessments of his mental capabilities.

When applying for SSI, Plaintiff completed a Disability Report.  (Id. at 143-51.)  He was then 6 feet 3 inches tall and weighed 296 pounds.  (Id. at 142.)  His impairments, see page two, supra, limit his ability to work by causing blackouts, mood swings, and anger.  (Id. at 143.)  These impairments first interfered with his ability to work in 1997 and prevented

---

[8]Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects up to 25 pounds."  20 C.F.R. § 416.967(c).  If someone can do medium work, he can do sedentary or light work.  Id.

him from working on December 31, 2003. (Id.) He stopped working, however, on November 30, 2008, when his job ended. (Id.)

Asked to describe on a Function Report what he does during the day, Plaintiff reported that he takes a shower, gets dressed, watches television, plays on the computer, goes to the store, cleans the house, picks his children up from school, helps them with their homework, fixes something to eat, watches television or uses the computer, sends the children to bed, and then goes to bed himself. (Id. at 165.) Before his illnesses, he was able to complete tasks, concentrate, and sit for long periods of time. (Id. at 166.) He has no problem with personal care tasks. (Id.) One to three times a week, he fixes sandwiches, heats frozen dinners, or gets "take out." (Id. at 167.) He does the cleaning, laundry, mowing, and household repairs. (Id.) He needs encouragement to do these chores because he is easily frustrated and angered. (Id.) Once or twice a week, he shops for household items and clothes. (Id. at 168.) One to four times a week, he spends time with other people talking on the telephone, in person, or on the computer. (Id. at 169.) He visits with people at their house, his house, or in stores. (Id.) Plaintiff also reported that he does not like to be around people because he cannot control his anger. (Id. at 170.) His impairments adversely affect his abilities to complete tasks and get along with others. (Id.) They do not adversely affect his abilities to, among other things, follow instructions, remember, understand, or concentrate. (Id.) He can walk about two miles before having to stop and rest for thirty minutes. (Id.) He can pay attention for five to ten minutes. (Id.) He does not finish what he starts. (Id.) He can follow spoken instructions, but gets frustrated when following written

instructions.  (Id.)  He does not get along with authority figures; they act like they are better than him.  (Id. at 171.)  He has never been fired or laid off from a job; he usually quits after getting angry with supervisors or coworkers.  (Id.)  He does not handle stress well, but does handle changes in routine well.  (Id.)  He has noticed that he is physically and emotionally violent to family members.  (Id.)  He imagines hurting people.  (Id.)

Plaintiff's wife completed a Function Report – Third Party on his behalf.  (Id. at 154-61.)  Her answers mirrored his, with the exception that she added "memory" to the list of abilities adversely affected by his impairments.  (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his application.  (Id. at 179-85.)  As of approximately March 15, 2010, his depression and pain had increased.  (Id. at 180.)  He did not have any new illnesses or conditions since he had completed the original disability report.  (Id.)

The relevant medical records, summarized below in chronological order, begin with those of the Missouri Department of Corrections (DOC).  (Id. at 204.)  The January 2002 DOC records for Plaintiff list a diagnosis of bipolar II disorder in remission; his mental status was within normal limits.  (Id. at 204.)  These observations were repeated in February.  (Id.)  In March, Plaintiff reported feeling tired and restless; his mental status was within normal limits.  (Id. at 205.)  It was noted on April 3 that Plaintiff refused to take trazodone because of the side effect of priapism.[9]  (Id.)  On April 15, he reported that he was doing well; he

---

[9]Priapism is the "[p]ersistent erection of the penis . . . resulting from a pathologic condition rather than sexual desire."  Stedman's Medical Dictionary, 1452 (26th ed. 1995) (Stedman's).

wanted to stop taking his medications.  (Id. at 206.)  On May 14, he reported that he was doing okay without his medications, but he had been given a conduct violation for disobeying a direct order.  (Id.)  Three days later, he informed the nurse that he had been diagnosed with bipolar disorder when he was twenty years old.  (Id. at 207.)  He was to be released the next month and planned on living with his girlfriend.  (Id.)  He wanted to see if he could manage his attitude and temper without medications.  (Id.)  The longest period he had been off medications was for six to seven months.  (Id.)

There are no relevant medical records from 2003.

The next relevant medical record is of a February 2004 emergency room visit to Hannibal Regional Hospital for acute low back pain that had begun three to four hours earlier when he bent over in the car to fasten the belt on a child's car seat.  (Id. at 518-24.)  The pain was a seven on a ten-point scale.  (Id. at 521.)  The pain decreased to a three after Plaintiff was given Toradol, a nonsteroidal anti-inflammatory drug,[10] and morphine.  (Id. at 522.)  An x-ray of his lumbar spine was normal.  (Id. at 523.)  He was discharged home with instructions to follow-up with his primary care physician.  (Id. at 522, 524.)

Plaintiff consulted Michael Gadson, M.D., on June 28 for "help with [his] temper." (Id. at 267-68.)  Plaintiff "state[d] that everything 'ticks him off.'"  (Id. at 267.)  His symptoms began in 1997 after he graduated from high school and had become progressively worse. (Id.)  He had been looking for employment, unsuccessfully, and sat home and watched his

_____

[10]See Toradol, http://www.drugs.com/search.php?searchterm=toradol (last visited July 23, 2013).

children.  (Id.)  He thought his felony conviction was preventing him from getting a job.  (Id.)  "He acknowledge[d] some depression and lots of frustration."  (Id.)  He felt very irritable and was "set off by small stuff to the point of blacking out and at one point possibly hearing voices."  (Id.)  On examination, he was casually dressed and groomed; was alert and oriented to person, place, and time; had clear, coherent, and goal-directed, but slow, monotone speech; had a depressed mood; and had fair attention, concentration, and memory.  (Id. at 268.)  His judgment and insight were fair; his motivation for treatment was good.  (Id.)  He was noted to be of average to slightly-below average intelligence.  (Id.)  Dr. Gadson diagnosed Plaintiff with bipolar disorder, current phase depressed, and intermittent explosive disorder.  (Id.)  Plaintiff's current Global Assessment of Functioning (GAF) was 45[11]; in the past year, it had been 55.[12]  (Id.)  Dr. Gadson started Plaintiff on Lamictal[13] and gave Plaintiff an adult assessment for Attention Deficit Hyperactivity Disorder (ADHD) to be completed at home.  (Id.)

---

[11]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

[12]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

[13]Lamictal is prescribed for the treatment of bipolar disorder in adults.  PDR at 1436.

The following month, Plaintiff had an initial psychosocial/clinical assessment at Preferred Family Health Care (PFHC). (Id. at 260-66.) He was living with his sister and had a girlfriend. (Id. at 260.) He and his girlfriend had two children together. (Id.) During the interview, he was cooperative and had good eye contact. (Id.) He reported that he had checked himself into the Arthur Center, but they only wanted to put him on medications and he needed someone to talk to. (Id.) He was on probation after having been released from prison in June 2002 after serving twenty-one months. (Id. at 261.) His probation officer needed a letter from his case worker stating that he was attending and getting services from PFHC. (Id.) His psychiatrist was Dr. Gadson. (Id.) His current medications included Ritalin and Lexapro, although he was not sure of the dosage or when they should be taken. (Id.) The medications were not helping him. (Id.) He had Medicaid. (Id.) He also reported that he had stopped taking his medications when he got out of jail and that they had helped with his anger and temper. (Id. at 262.) He was depressed because he did not have a job. (Id.) He had done construction work, but did not like the traveling. (Id. at 263.) He enjoyed factory work. (Id.) And, "he ha[d] been doing odd jobs to make some money." (Id.) He did not think that "his symptoms contributed to his working status." (Id.) He had graduated from high school. (Id. at 265.) When his children started school, he wanted to try to go to college. (Id.) His psychiatric symptoms did not interfere with his ability to engage in leisure activities, including playing sports and taking his children to the park. (Id.)

Plaintiff went to the emergency room at Hannibal Regional Hospital on August 4 for treatment of back pain after he hurt his back when bending over to give his daughter a bath.

(Id. at 499-505.)  He was diagnosed with an acute lumbar strain; given prescriptions for Soma,[14] Tylenol, and Motrin; and instructed to apply ice to his back and follow up with his primary care physician.  (Id. at 499, 505.)

In October, Plaintiff was discharged from PFHC after "fail[ing] to engage" after two initial appointments with the psychiatrist.  (Id. at 259.)  The diagnosis was bipolar disorder, current phase depressed, and intermittent explosive disorder.  (Id.)

Plaintiff had a physical examination in November as an enrollment requirement for heavy equipment school.  (Id. at 428.)  He reported that he felt good.  (Id.)  The exam was normal.  (Id.)

Plaintiff went to the emergency room at Pike County Memorial Hospital (PCMH) in December for complaints of abdominal pain after a child jumped on his stomach.  (Id. at 403-09.)  A chest x-ray revealed borderline cardiomegaly with no acute pulmonary infiltrates; an abdominal x-ray revealed a nonspecific gas pattern without evidence of obstruction, mass, or free air into the diaphragm.  (Id. at 409.)

There are no relevant medical records from 2005.

Plaintiff returned to the PCMH emergency room in October 2006 for treatment of a puncture wound in his right thigh resulting from a fall at work.  (Id. at 396-402.)

In November, he was seen at the emergency room for complaints of being unable to move his left shoulder after he fell on it.  (Id. at 389-95.)  An x-ray showed no dislocation.

---

[14]Soma is a muscle relaxer.  See Soma, http://www.drugs.com/search.php?searchterm=soma (last visited July 23, 2013).

(Id. at 393, 395.) After the shoulder was placed in an immobilizer, he had good circulation, sensation, and motion in his left hand. (Id. at 393.) After being given pain medication, his pain decreased from a high of seven to three. (Id.) He was to follow up with an orthopedic surgeon for consultation. (Id. at 394.)

He was seen again at the PCMH emergency room on December 23 for pain caused by a kidney stone. (Id. at 371-88.) A computed tomography (CT) scan revealed an eight millimeter calculus (stone[15]) in his left kidney and a one to two millimeter calculus in the central portion of that kidney. (Id. at 383.) Plaintiff was given Vicodin.[16] (Id. at 384.) The next day, a stent was placed in his left ureteral. (Id. at 416-19.)

There are no relevant medical records from 2007 and 2008.

On June 11, 2009, Plaintiff was seen at the Hannibal Regional Hospital emergency room for complaints of flank pain for the past week that was a six on a ten-point scale. (Id. at 482-98.) He was not currently taking any medication, but was supposed to be taking lovastatin.[17] (Id. at 483.) He was described as being in no apparent distress, having a calm and appropriate affect, and being alert and oriented to time, place, and person. (Id. at 484.) After being given Toradol intravenously and Tussionex (a cough medication) orally, Plaintiff reported that his pain was a one. (Id. at 483.) He was diagnosed with pleurisy, an upper

_____

[15]See Stedman's at 261.

[16]Vicodin is a combination of hydrocodone, an opioid analgesic, and acetaminophen. PDR at 573. It is prescribed for the relief of moderate to moderately severe pain. Id.

[17]See note 20, infra.

respiratory infection, and a left kidney stone.  (Id. at 497.)  He was discharged in satisfactory condition with instructions to follow up with his physician.  (Id. at 489, 491.)

On July 1, Plaintiff was seen at the PCMH emergency room for abdominal pain that had begun June 11.  (Id. at 305-23.)  Two days earlier, he had run out of the Vicodin that had been prescribed when he was seen in the emergency room at Hannibal.  (Id. at 307, 312.) The pain had then returned, and was worse than ever.  (Id.)  He had also run out of the cough medication given him to reduce the fluid in his right lung.  (Id. at 312-13.)  Chest x-rays were negative.  (Id. at 314, 318.)  A CT scan of his abdomen and pelvis showed nonobstructive left nephrolithiasis (kidney stones[18]), fatty infiltration of the liver, and diverticulosis without acute diverticulitis.  (Id. at 319.)  Plaintiff was discharged home with prescriptions for three medications, including Vicodin,[19] and with instructions to follow up with his physician if he was not better in four to five days.  (Id. at 314, 323.)

Plaintiff returned to the PCMH emergency room on September 7 for treatment of abdominal pain that had begun four hours earlier.  (Id. at 287-304.)  He described the pain as a seven on a ten-point scale.  (Id. at 288.)  It was noted that he could laugh and joke.  (Id.) Lab work was unremarkable.  (Id. at 295-98.)  X-rays of his abdomen revealed findings consistent with an inflammation of the pelvis or with acute diverticulitis with secondary inflammation of the appendix.  (Id. at 300-01.)  Also present was a nine millimeter nonobstructing kidney stone.  (Id.)  Shortly after Plaintiff was given pain medication, he

---

[18]See Stedman's at 1183.

[19]The names of the other two medications are illegible.

- 13 -

reported that his pain was a three to four.  (Id. at 295.)  He was discharged less than three hours after arrival.  (Id.)

Plaintiff returned the next day.  (Id. at 324-66.)  A CT scan revealed that the problem was diverticulitis and not appendicitis.  (Id. at 328.)  Plaintiff was admitted to the hospital, and was given intravenous (IV) antibiotics and oral pain medication.  (Id. at 329, 341- 342.) A CT scan taken two days later of his abdomen and pelvis revealed the diverticulitis and unchanged left nephrolithiasis.  (Id. at 357-58.)  Plaintiff was discharged the same day as the scan was taken with instructions to follow a diet with increased fiber, continue taking the antibiotics, and monitor his food intake.  (Id. at 342, 366.)  The discharge diagnosis was acute diverticular disease.  (Id. at 343.)  Plaintiff was to be rechecked in one week.  (Id.)

Consequently, he was seen on September 14 at the Pike Medical Clinic for a follow-up.  (Id. at 426-27.)  He was okay.  (Id.)

In February 2010, Plaintiff went to the PCMH emergency room for complaints of rectal pain.  (Id. at 558-65.)  It was noted that he had not taken his Mevacor[20] for over one year.  (Id. at 564.)  He was diagnosed with hemorrhoids and diverticulitis.  (Id. at 565.)

Plaintiff was seen in May at the Hannibal Free Clinic.  (Id. at 465-76.)  He reported that he not been taking his medications because he could not afford them.  (Id.)  He wanted to control his anger.  (Id. at 466.)  He had a history of physical and mental abuse, and had tried to hit his boss with a sledge hammer.  (Id.)  He had been incarcerated from 1998 to 2002 for assault.  (Id.)  He had a history of bipolar disorder, paranoid schizophrenia, anger

---

[20]Mevacor is a brand name for lovastatin, a cholesterol lowering agent.  PDR at 2175.

disorder, nephrolithiasis, and hyperlipidemia.  (Id.) He might have sleep apnea.  (Id.)  He had "black outs" during which he would not pass out but also would not remember anything.  (Id. at 470.)  He had poor eye contact.  (Id.)  He was started on Risperdal[21] and on Vytoren.  (Id. at 466.)   One week later, he called to complaint of headaches and nausea.  (Id. at 465.)  He was to stop taking the Vytoren until it could be ruled out as the cause of those problems. (Id.)

He returned to the Hannibal Free Clinic on June 1, reporting that he had been placed on Medicaid four days earlier.  (Id. at 463-64.)  He was diagnosed with bipolar disorder and paranoid schizophrenia.  (Id. at 464.)  The only exam notes are of auditory hallucinations. (Id.)  He was started on Celexa, an anti-depressant,[22] and Risperdal and encouraged to exercise.  (Id.)  His weight was 304 pounds.  (Id.)

Two weeks later, Plaintiff was seen by Peter D. Peril, M.D., who recommended that he have a colonoscopy, lab work, and a CT scan of his abdomen and pelvis.  (Id. at 549-51.) The CT scan showed fatty infiltration of the liver; sigmoid diverticulosis without evidence of diverticulitis; and stable left renal calculus.  (Id. at 555.)  The results of the lab work were normal.  (Id. at 556-57.)  Plaintiff had a colonoscopy on June 30, revealing "a few scattered diverticula" and "[i]nternal hemorrhoids."  (Id. at 552-54.)

On July 14, Plaintiff consulted Scott P. Simmons, M.D., with the Hannibal Regional Medical Group, Family Practice, about his symptoms of nervousness, anger, hopelessness,

---

[21]See note 6, supra.

[22]See Celexa, http://www.drugs.com/celexa.html (last visited July 23, 2103).

and helplessness.  (Id. at 539-40.)  His work status was described as "waiting for disability."

(Id.)  He had taken the Celexa and Risperdal for only two weeks.  (Id.)  His psychiatric

problems included anger, depression, mood changes, bipolar, schizophrenia, irritability, and

sleep problems.  (Id.)  On examination, he was alert and oriented to time, place, and person.

(Id. at 540.)  He had an angry mood and affect, intact associations, and appropriate insight.

(Id.)  He was diagnosed with schizophrenia, paranoid, and bipolar disorder, not otherwise

specified.  (Id.)  Dr. Simmons opined that Plaintiff would benefit from counseling about his

explosive anger disorder.  (Id.)  He was to see Dr. Spalding that same day.  (Id.)

He did.  (Id. at 537-38.)  Joseph L. Spalding, D.O., noted Plaintiff's report that he had

been hospitalized in 1998 and diagnosed with bipolar disorder and intermittent explosive

disorder.  (Id. at 537.)  He had also been in prison for three years after being convicted of

assaulting an officer.  (Id.)  He had "had anger issues all his adult life" and was applying for

disability.  (Id.)  He isolated himself when he became angry.  (Id.)  Marijuana had helped to

calm him, but he had not used it in six months.  (Id.)  On examination, he was alert and

oriented and had an anxious mood and affect.  (Id. at 538.)  His speech was normal in rate

and rhythm; his thought was logical and goal directed; his insight and judgment were fair to

poor.  (Id.)  Dr. Spalding's diagnosis was cannabis dependence and bipolar I disorder, manic,

most recent episode severe with psychotic features.  (Id.)  He rated Plaintiff's GAF as 45.

(Id.)  He prescribed Depakote, Seroquel, and trazodone.  (Id.)

Also on the referral of Dr. Simmons, Plaintiff was examined on July 19 by Prashanth

Podaralla, M.D., for an evaluation of his kidney stones.  (Id. at 570-72.)  An ultrasound

revealed an inferior pole in the left kidney, "most probably renal calculus." (Id. at 572.) Plaintiff was advised to increase the amount of water he drank and to drink lemonade to prevent stones from forming. (Id. at 571.)

Plaintiff again saw Dr. Spalding on September 9, reporting that he was taking his medication and was "a 'little bit better with anger.'" (Id. at 535-36.) He was appealing the denial of disability. (Id. at 535.) He could not "keep a job because he [couldn't] deal with begin [sic] around people." (Id.) He felt that he was a "'bad man'" and had "very negative thoughts about harming people when they [did] something he [felt] [was] wrong." (Id.) He thought he might be going to jail for back child support and wanted Dr. Spalding to write to Child Enforcement that Plaintiff was disabled and unable to make payments. (Id.) His disabled sister was living with him and his wife; they were trying to get her into a group home. (Id.) His prescription for Depakote was renewed; his prescription for Seroquel was reduced in dosage. (Id.)

Plaintiff reported to Dr. Spalding on October 15 that he was doing "'pretty good'" and the Depakote was "help[ing] considerably." (Id. at 533-34.) He was sleeping well and rarely taking the trazodone. (Id. at 533.) He denied any psychotic symptoms. (Id.) He was due in court in ten days on a charge of driving while his license was revoked; he was not sure if he would serve any time in jail. (Id.) His prescriptions were renewed. (Id.)

When Plaintiff saw Dr. Spalding in December, he was, in his own words, "[s]till doing well." (Id. at 531-32.) The driving while suspended charge had been dropped. (Id.) He wanted to change his Seroquel prescription because it made him drowsy in the morning. (Id.)

On examination, his insight and judgment were "much improved." (Id. at 532.) His mood and affect were pleasant and cooperative. (Id.) His Seroquel prescription was discontinued. (Id.) Lab work was performed and checked. (Id. at 480-81, 532.)

Plaintiff informed Dr. Spalding on February 8, 2011, that he was not doing well and his medications were not working. (Id. at 529-30.) His wife, who had accompanied Plaintiff to the visit, felt Plaintiff was "much better since getting on meds" and stated that he had not "lashed out at anyone." (Id. at 529.) She thought he was "more depressed given the season and not having enough to do." (Id.) On examination, his mood and affect were depressed, but cooperative. (Id. at 530.) His insight and judgment appeared fair. (Id.) He was prescribed Risperdal and trazodone. (Id.) His Depakote dosage was to be reassessed after lab work was checked. (Id. at 478-79, 30.)

At his March visit to Dr. Spalding, Plaintiff reported that he occasionally yelled, "but never out of hand like before." (Id. at 526-28.) His mood was "'pretty good.'" (Id. at 526.) Overall, he was doing "very well." (Id.) There were no side effects to his medications. (Id.) He was waiting on disability. (Id.) Dr. Spalding described Plaintiff as "stable." (Id. at 527.) Plaintiff was to return in two months. (Id.)

Also before the ALJ were various assessments of Plaintiff's mental functioning. The earliest of these is the February 2010 psychological evaluation of Plaintiff by David Peaco, Ph.D., a licensed psychologist, pursuant to Plaintiff's SSI application. (Id. at 431-36.) Plaintiff reported taking psychotropic medications when incarcerated "and for brief periods since then." (Id. at 431.) He was not currently receiving any mental health treatment. (Id.)

Plaintiff also reported that he had quit his most recent job as a construction laborer because of the stress of traveling, the fewer hours, and "conflict with his supervisors." (Id.) Dr. Peaco described Plaintiff's mental status as follows.

> [Plaintiff] had slightly increased motor activity and fidgetiness. He talked a lot during the evaluation. He cooperated with all the questions that were asked of him; but his attitude was consistently irritable and negativistic. His flow of thinking was very circumstantial. His affect was a little restricted. His mood was irritable, depressed, and a little anxious.
>
> His orientation was intact. He reported some mild problems with poor concentration. . . .
>
> When [Plaintiff] was asked if he felt depressed he responded "Yup." On a depression questionnaire he reported symptoms of depression in the areas of frequent feelings of sadness, . . . frequent irritability, lack of enthusiasm most days, not restful sleep, low energy, and poor self-esteem. . . .
>
> He reported no history of panic attacks.
>
> [Plaintiff] appears to have a history of manic episodes. He reported periods of extreme rages, physical hyperactivity, not needing to sleep, and being hyperverbal. During what appears to be his initial manic episode in 1996, he had some mild transient auditory hallucinations. These have not recurred. His periods of intense rage are also accompanied by memory blackouts and altered states of consciousness.
>
> He is independent regarding his personal hygiene and activities of daily living. He has some social contacts with friends. His persistence in tasks is very poor. His pace is slow. His concentration is moderately to severely impaired.

(Id. at 432.)

Plaintiff was reported to have a "fairly negative" attitude towards the intellectual testing, sometimes appearing to put forth less than an optimal effort and becoming easily frustrated and exasperated. (Id.) "He sometimes gave the appearance of giving up on the most difficult items." (Id.) On the Weschler Adult Intelligence Scale, Third Edition (WAIS-

III), Plaintiff had a full scale IQ of 74, a verbal IQ of 69, a performance IQ of 84, a verbal comprehensive index of 68, and a perceptual motor index of 89. (<u>Id.</u> at 433.) These results were described as potentially being "slightly low, but generally accurate." (<u>Id.</u> at 432-33.) His level of intellectual functioning was thought to be "very likely in the Borderline range." (<u>Id.</u> at 433.) Dr. Peaco's impression was of bipolar disorder, most recent episode depressed, intermittent explosive disorder, reading disorder, and mathematics disorder. (<u>Id.</u>) He had borderline intellectual functioning and a GAF of 60.[23] (<u>Id.</u>) Dr. Peaco assessed Plaintiff's persistence in completing tasks as being below average; his concentration as moderately to severely impaired; his social functioning as moderately to severely impaired due to mood and impulse control problems; and his capacity to cope as moderately impaired due to low levels of intellectual functioning and academic skills and to mood and impulse control problems. (<u>Id.</u>)

The following month, in March, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Maria Wilson.[24] (<u>Id.</u> at 448-58.) Plaintiff was described as having an organic mental disorder, i.e., a reading and mathematics disorder, and an anxiety disorder, i.e, bipolar, intermittent explosive disorder. (<u>Id.</u> at 448, 449, 451.) These disorders resulted in Plaintiff experiencing mild restrictions in his activities of daily living and moderate difficulties in social functioning and in maintaining concentration,

---

[23]<u>See</u> note 12, supra.

[24]There is no indication whether Ms. Wilson had any professional expertise.

persistence, or pace. (Id. at 456.) There was insufficient evidence of whether he had had any episodes of decompensation of extended duration. (Id.)

On a Mental Residual Functional Capacity Assessment, Ms. Wilson assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 459.) In the area of sustained concentration and persistence, he was moderately limited in two of eight listed abilities, i.e., carrying out detailed instructions and maintaining attention and concentration for extended periods. (Id. at 459.) He was not significantly limited in the remaining six abilities. (Id. at 459-60.) In the area of social interaction, Plaintiff was moderately limited in one of the five abilities, i.e., accepting instructions and responding appropriately to criticism from supervisors, and was not significantly limited in the remaining four. (Id. at 460.) In the area of adaptation, Plaintiff was again moderately limited in one ability, i.e., responding appropriately to changes in the work setting, and was not significantly limited in the remaining three abilities. (Id.) Ms. Wilson opined that Plaintiff was limited to simple work and "would do best in jobs that did not require intense of prolonged interaction with the public." (Id. at 461.)

A note dated April 5, 2011, from the Pike Medical Clinic, Inc., states that Plaintiff is unable to work due to anger at work. (Id. at 567.) The signature is illegible, but does not appear to be that of Dr. Spalding because the record refers to Plaintiff having cognitive processing therapy with Dr. Spalding. (Id.)

In May 2011, Plaintiff was again evaluated by Dr. Peaco. (Id. at 582-85.) Plaintiff reported that he had resumed taking psychotropic medications – trazodone, Risperidone, and divalproex[25] – a year earlier. (Id. at 582.) He lived with his wife of four years and their two elementary school-age children. (Id.) He also had three other school-age children from three other relationships. (Id.) During the examination, Plaintiff was "quite fidgety." (Id.) He cooperated and "appeared to put forth his best efforts." (Id.) His affect was normal; his mood was "somewhat depressed." (Id.) He was very quiet, but not irritable. (Id.) On the Stanford-Binet Intelligence Scale – Fourth Edition, he placed within the borderline intellectual functioning range. (Id. at 583.) Dr. Peaco noted that Plaintiff's composite test score of 73 on the Stanford-Binet was comparable to a Wechsler IQ score of 75. (Id.) Indeed, the Stanford-Binet results were "remarkably similar" to those on the WAIS-III. (Id.) Dr. Peaco diagnosed Plaintiff with the same disorders and the same GAF as in February 2010. (Id.) He found Plaintiff able to understand and remember simple instructions. (Id.) Plaintiff was mildly impaired in concentration and persistence in completing tasks; moderately impaired in his capacity to cope with the world around him; and markedly impaired in social functioning due to his problems controlling his mood and impulses. (Id.)

Completing a Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Spalding opined in June 2011 that Plaintiff's impairments (1) moderately affected his abilities to (a) carry out complex instructions and (b) make judgments on complex work-related decisions, and (2) mildly affected his abilities to (a) carry out simple

_____

[25]Divalproex sodium is the generic form of Depakote. See PDR at 425.

instructions, (b) make judgments on simple work-related decisions, and (c) understand and remember complex instructions. (Id. at 587.) The symptoms of Plaintiff's bipolar disorder with psychotic features included racing thoughts, flight of ideas, distractability, depressed affect, and changes in his sleep, appetite, and energy. (Id.) And, he had auditory hallucinations that, in the past, told him to harm others. (Id.) Plaintiff's impairments also (1) extremely[26] affected his ability to interact appropriately with supervisors and (2) markedly affected his abilities to (a) interact appropriately with co-workers and the public and (b) respond appropriately to usual work situations and to changes in a routine work setting.[27] (Id. at 588.) His disability began on December 31, 2003. (Id.)

## The ALJ's Decision

The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since his amended alleged onset date of July 26, 2008. (Id. at 27.) She next found that Plaintiff had severe impairments of a history of kidney stones, a history of diverticulitis, intermittent explosive disorder, borderline intellectual functioning, cannabis dependence, and bipolar I disorder with psychotic features. (Id.) He had not mentioned dizziness to any health care professional treating him after his alleged disability onset date. (Id. at 28.) He had mentioned black-outs only once after that date, and then it was not to his treating psychiatrist, Dr. Spalding. (Id.) Plaintiff did not, however, have an impairment or

---

[26]The box labeled "marked" was checked and then crossed out for this ability.

[27]The Statement form defines "marked" as a "serious limitation" and a "substantial loss in the ability to function satisfactorily." "Extreme" is defined as a "major limitation" and "no useful ability to function in [the] area." (R. at 587.)

combination of impairments that met or medically equaled an impairment of listing-level severity, including Listing 12.05 (mental retardation). (Id.) The ALJ noted that Plaintiff had not received any psychiatric treatment until June 2010 and that his symptoms were relatively effectively controlled by psychiatric medications once he began taking them. (Id.) He had mild restrictions in his activities of daily living, moderate difficulties in social functioning, and moderate difficulties with concentration, persistence or pace. (Id. at 28-29.) He had not experienced any episodes of decompensation of extended duration. (Id. at 29.) Additionally, he did not meet the requirements of paragraph A[28] of Listing 12.05 because he was able to care for his own personal needs, go out alone, drive, take care of his two young children, and, previously, hold construction jobs. (Id.) He did not meet the requirements of paragraph B because he did not have a valid verbal, performance, or full scale IQ of 59 or less. (Id. at 30.) He did not meet the requirements of paragraph C because he did not have a valid verbal, performance, or full scale IQ of 60 through 70 and an additional and significant work-related functional limitation caused by a physical or mental impairment. (Id. at 30.) Nor had he ever been diagnosed with mental retardation as required by Listing 12.05. (Id.)

The ALJ then turned to the question of Plaintiff's residual functional capacity (RFC). She found that he had the RFC to perform medium work with an additional restriction of (a) being limited to simple, unskilled, routine tasks; (b) having limited interaction with the public, coworkers, and supervisors; and (c) having minimal work associations with coworkers

---

[28]Paragraph A requires a showing that the claimant is dependent on others for personal needs, e.g., bathing, and is unable to follow directions, "such that the use of standardized measures of intellectual functioning is precluded." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05(A).

or supervisors. (Id.) When reaching this conclusion, the ALJ assessed Plaintiff's credibility. (Id. at 31-35.) After summarizing Plaintiff's testimony and the medical records, the ALJ found that he had "not generally received the type of medical treatment one would expect for a totally disabled individual." (Id. at 31-35.) There were "significant gaps" in his treatment, which had been "essentially routine and/or conservative in nature." (Id. at 35.) The treatment had also "been generally successful in controlling his symptoms." (Id.) The ALJ stated that she had based her assessment of his credibility about his symptoms and their effect on the objective medical evidence. (Id.) She described his description of the severity of his symptoms as "so extreme as to appear implausible." (Id.) For instance, he described having blackouts four to five times a week, but mentioned them to a health care provider only once, and described having dizzy spells three to five times a week, but never mentioned them to a health care provider. (Id.) He complained of trouble sleeping, but daily drank a six-pack of Mountain Dew and smoked a pack of cigarettes. (Id.) Plaintiff's daily activities were not as limited as would be expected from his descriptions of his symptoms. (Id. at 37.) For instance, Plaintiff reported that he watched television, played video and computer games, helped take care of his children, and did household chores, including preparing simple meals and cleaning. (Id.) And, his use of medications did not suggest the presence of greater impairments than she found. (Id.) Once he started taking medications, they were "relatively effective in controlling his symptoms." (Id.) His sporadic work history called into question whether his unemployment was "actually due to medical impairments." (Id.) Also detracting from his credibility was the vague and inconsistent description of his limitations and

symptoms. (Id.) Additionally, the ALJ noted that Plaintiff's financial problems were stressful. (Id. at 33, 35.)

Addressing the opinions of Drs. Peaco and Spalding, the ALJ found the more recent of Dr. Peaco's opinions was entitled to greater weight than his first opinion as Plaintiff was then on medication and receiving treatment. (Id. at 36.) She further found that Dr. Peaco's opinion that Plaintiff was markedly impaired in social functioning was "vague and conclusory." (Id.) Dr. Spalding's opinion was given "some weight." (Id.) It also, however, was conclusory and was "open to interpretation." (Id.) Dr. Spalding's reference to Plaintiff having "'extreme' to 'marked' limitations with social functioning" was unclear. (Id.) Her RFC assessment limiting Plaintiff to minimal interaction with others reflected some of the opinions of Drs. Peaco and Spalding. (Id.)

With his RFC, Plaintiff was unable to perform any past relevant work. (Id. at 38.) With his RFC, age, and high school education, he was able, however, to perform jobs that exist in significant numbers in the state and national economies. (Id. at 38-39.) Those jobs include floor waxer and kitchen helper. (Id. at 39.)

For the foregoing reasons, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve

months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 416.920; **Hurd**, 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 416.1520(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these

requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Ingram v. Chater, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and

set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e).  The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to his past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 416.920(f).  The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred by (1) not finding that his verbal IQ score of 69 satisfied Listing 12.05C; (2) not giving the opinion of Dr. Spalding the appropriate weight; and (3) not properly (a) assessing his credibility and (b) explaining that assessment.

Listing 12.05C. The introductory paragraph to Listing 12.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates of supports onset of the impairment before age 22."[29] 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05. The required level of severity for Listing 12.05 is met when the requirements of one of four paragraphs are satisfied. Id. One of those four, paragraph C, requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. "The additional limitation need not be disabling, but it must have a 'more than slight or minimal effect on [the claimant's] ability to perform work.'" **McNamara v. Astrue**, 590 F.3d 607, 611 (8th Cir. 2010) (quoting Sird v. Chater, 105 F.3d 401, 403 (8th Cir. 1997)). As with any other listing, the burden is on the claimant to prove that his or her impairment meets all of Listing 12.05C's criteria. See **Carlson v. Astrue**, 604 F.3d 589, 593 (8th Cir. 2010). Plaintiff contends that his February 2010 verbal IQ score of 69 satisfies the first

---

[29]The Court notes that the requirements in the introductory paragraph to Listing 12.05 are mandatory. **Maresh v. Barnhart**, 438 F.3d 897, 899 (8th Cir. 2006).

requirement of Listing 12.05C.[30]  It is undisputed that this is the only IQ score that falls within the range of Listing 12.05C.

"'[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning.'"  **Phillips**, 721 F.3d at 626 (quoting Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001)) (alteration in original).[31]  An ALJ "'is not required[, however,] to accept a claimant's IQ scores . . . and may reject scores that are inconsistent with the record.'"  **Miles v. Barnhart**, 374 F.3d 694, 699 (8th Cir. 2004) (quoting Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1988)) (second alteration in original).  "'Indeed, test scores of this sort should be examined to assure consistency with daily activities and behavior.'"  **Id.** (quoting Clark, 141 F.3d at 1255).

The only IQ score that Plaintiff received that placed him in the range of the first requirement under Listing 12.05C was the verbal IQ score of 69 that he received when given the WAIS-III test by Dr. Peaco, a non-treating psychologist, in February 2010.  Plaintiff was then thirty-two years old.  He had never been diagnosed as, or suspected of, being mentally

---

[30]The requirement of an additional limitation does not appear to be in dispute.  It is irrelevant, however, if the first requirement is not met.  See **Phillips v. Colvin**, 721 F.3d 623, 629 n.4 (8th Cir. 2013).

[31]In Phillips, the court rejected the claimant's argument that the district court was precluded finding that there had been a change in his intellectual functioning.  **Phillips**, 721 F.3d at 626-27.  Distinguishing Phillips' case from that of Muncy's, the court noted that the twenty-five point IQ discrepancy in Muncy was at least twice that of the discrepancy in Phillips.  **Id.** at 627.  Moreover, the ALJ in Phillips had addressed the discrepancy in IQ scores, whereas the ALJ in Muncy had not.  **Id.**  Supporting the ALJ's conclusion in Phillips that the more recent IQ score was more accurate was his finding that the latter was more consistent with Phillips' daily activities.  **Id.**

retarded. Indeed, Dr. Peaco diagnosed him as having borderline intellectual functioning[32]; and, this was the first diagnosis in the record of any intellectual impairment. Moreover, the IQ score of 69 was the result of a test on which Plaintiff gave less than an optimal effort, easily became frustrated, and appeared to give up on difficult questions. See **Johnson v. Barnhart**, 390 F.3d 1067, 1071 (8th Cir. 2004) (ALJ properly considered (a) consulting psychologist's opinion that claimant was malingering when taking IQ tests that placed him in the range of mental retardation and (b) the psychologist's diagnosis of borderline intellectual functioning); **Clark**, 141 F.3d at 1256 ("find[ing] it significant in gauging the reliability of [the claimant's current IQ scores" that nothing in her medical records indicated that she was ever suspected of being mildly mentally retarded prior to her low IQ scores on exam by non-treating psychologist).

It was also relevant that Plaintiff had not claimed mental retardation, or even borderline intellectual functioning, as an impairment when applying for SSI. See **Clay v. Barnhart**, 417 F.3d 922, 929 (8th Cir. 2005) (holding that ALJ's finding that claimant did not satisfy Listing 12.05C criteria was supported by, among other things, her failure to initially claim mental retardation and the lack of treatment or diagnosis for such). Nor has Plaintiff ever been terminated from a job because of a lack of intellectual ability. See **Miles**, 374 F.3d at 699 (holding that ALJ's finding that claimant did not satisfy Listing 12.05C criteria was supported by, among other things, evidence that she had never been terminated from a job due

---

[32]The range of IQ scores for borderline intellectual functioning is between 71 and 84. See **Holz v. Apfel**, 191 F.3d 945, 947 (8th Cir. 1999).

to lack of mental ability). Additionally, Plaintiff was able to play on the computer, read, write, help his children with homework, and obtain a driver's license. See **Clark**, 141 F.3d at 1256 (holding that ALJ's finding that claimant did not satisfy Listing 12.05C criteria was supported by, among other things, her ability to read, write, count money, and obtain a driver's license). Cf. **Christner v. Astrue**, 498 F.3d 790, 794 (8th Cir. 2007) (remanding Listing 12.05C case for further consideration of evidence that claimant could not read or write and dropped out of school at least by the eighth grade).

Plaintiff argues that the ALJ failed in her duty to develop the record by not inquiring of Dr. Peaco about the inconsistency in the scores of the two tests and by not eliciting testimony by a medical expert of how the Stanford-Binet scores translate to WAIS-III. Both arguments are unavailing. As the court in **Phillips** noted, even if the claimant's earlier IQ scores were valid, they gave rise to conflicting medical evidence, which it was the duty of the ALJ to resolve. 721 F.3d at 629. Thus, in the instant case, the ALJ did not err in considering as relevant when resolving the question of the lower IQ score that Plaintiff had put forth less than an optimal effort when taking that test and had put forth his best effort when taking the second test. And, Dr. Peaco noted in his second report that the Stanford-Binet results were "remarkably similar" to those on the WAIS-III. His conclusion in both reports was that Plaintiff had borderline intellectual functioning, not mental retardation. See **Johnson v. Astrue**, 627 F.3d 316, 319-20 (8th Cir. 2010) (rejecting claimant's argument that ALJ failed in duty to develop the record by not recontacting state agency examiner and request IQ test; examiner had reported that he would have conducted IQ test if it was warranted); **Cox v.**

**Astrue**, 495 F.3d 614, 618-19 (8th Cir. 2007) (determining that there was no need for further clarification when IQ test scores placed claimant in mild mental retardation range but consulting psychologist, who had administered tests, opined that claimant's adaptive behavior was more consistent with borderline intellectual functioning; the ALJ found that claimant's daily activities, ability to effectively communicate, and self-sufficient behavior were more consistent with borderline intellectual functioning).

Plaintiff also contends that the ALJ erred by considering how he functions only on his "good days" and ignoring his "bad" days and the nature of his bipolar disorder. (Pl.'s Br. at 7.) This error is allegedly manifested by the ALJ giving greater weight to Dr. Peaco's second evaluation of Plaintiff than to his first. Dr. Peaco's first evaluation was in February 2010. Plaintiff then informed Dr. Peaco that he was not receiving any mental health treatment. When seen at a clinic three months later, Plaintiff reported that he had not been taking his medications because he could not afford them. Dr. Peaco's second evaluation was in May 2011. Plaintiff then reported that the had resumed taking his medications a year earlier. In both evaluations, Dr. Peaco assessed him as having a GAF of 60, indicative of moderate symptoms. In the first evaluation, Dr. Peaco noted that Plaintiff had a negative attitude about the IQ testing and did not give his best effort. In the second evaluation, Plaintiff did give his best. Thus, the difference between the two was the effort exerted by Plaintiff. As noted above, a lack of effort is a proper consideration when evaluating the weight to be given an IQ test.

Dr. Spalding's Opinion.  Plaintiff next argues that the ALJ erred by giving only "some weight" to Dr. Spalding, his treating physician.  In June 2011, Dr. Spalding assessed Plaintiff as being markedly affected in three of four abilities relative to his interactions with others and extremely affected in the fourth ability.  In her RFC assessment, the ALJ restricted Plaintiff to limited interaction with the public, coworkers, and supervisors and to minimal work associations with coworkers or supervisors.  Dr. Spalding assessed Plaintiff as being mildly affected in his abilities to carry out simple instructions, to make judgments on simple work-related decisions, and to understand and remember complex instructions.  The ALJ restricted Plaintiff to simple, unskilled, routine tasks.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)[33]) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009).  "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted).  Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other

_____

[33]Citations to 20 C.F.R. §§ 404.1527 and 416.927 are to the 2010 version of the Regulations in effect when the ALJ rendered his adverse decision. The Regulations's most recent amendment, effective March 26, 2012, reorganizes the relevant subparagraphs but does not change their substance.

substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201

F.3d 1010, 1013-14 (8th Cir.2000)).  Also relevant are the length of the treatment

relationship, the frequency of examinations, supportability, consistency, and specialization

of the treating physician.  See 20 C.F.R. § 416.927(d)(2)(i), (3), (4), and (5).

Dr. Spalding examined Plaintiff six times before evaluating his ability to do work-

related activities.  The first time, in July 2010, Plaintiff informed Dr. Spalding that he had

anger issues and was applying for disability.  His thought was logical and goal directed.  His

insight and judgment were fair to poor.  When seen earlier the same day by Dr. Simmons, his

insight had been described as appropriate.  Two months later, Plaintiff reported to Dr.

Spalding that he was taking the medication prescribed him at the first visit.  He was appealing

the denial of his disability application and was potentially going to jail for back child support.

He also reported that he could not keep a job because he did not like being around people.

The following month, in October, he stated that he was doing "'pretty good'" and denied any

psychotic symptoms.  (R. at 533.)  In December, Plaintiff was "'[s]till doing well'"[34]; his

insight and judgment had improved.  (R. at 531.)  His insight and judgment appeared to be

fair when Dr. Spalding next saw Plaintiff, in February 2011.  He reported that he was not

---

[34]Citing **Hutsell v. Massanari**, 259 F.3d 707 (8th Cir. 2001), Plaintiff argues that the an ALJ may not rely on a mental health professional's statement that a patient is "'doing well'" "because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity." **Id.** at 712.  Plaintiff's reliance on this case is misplaced. The reference to the claimant doing well in **Hutsell** was made by her psychiatrists in the context of their treatment of her over a period of years and described how she was doing in the treatment programs.  **Id.** at 709, 712.  In the instant case, it is Plaintiff's own description of how he was generally doing that included "well."

doing well and the medications were not working; his wife reported that he was doing better when on medication. She attributed any downturn in his mental health to the season and to Plaintiff not having enough to do. At the last visit, in March 2011, Plaintiff was doing "very well." (R. at 526.)

As is evident from the foregoing summary of the records of Plaintiff's visits to Dr. Spalding, Dr. Spalding's treatment notes do not support his findings of marked or extreme limitations in Plaintiff's ability to interact with others. An ALJ may properly discount a treating physician's medical source statement if the limitations contained therein are not referred to, or reflected in, in that physician's treatment notes. See **Anderson v. Astrue**, 696 F.3d 790, 794 (8th Cir. 2012); **Martise v. Astrue**, 641 F.3d 909, 925 (8th Cir. 2011). It is also proper to discount the limitations in such statement if the statement is, as was Dr. Spalding's, in "a conclusory checkbox form." **Anderson**, 696 F.3d at 794. See also **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010) (holding that the ALJ properly discounted a treating physician's opinion when, inter alia, that opinion was in a checklist format).

Moreover, insofar as Dr. Spalding's conclusions are supported by his treatment notes, the support lies in Plaintiff's own reports of how he is functioning, not by Dr. Spalding's contemporaneous observations. See **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (finding that substantial evidence supported ALJ's decision to partially discredit treating physician's opinion about claimant's RFC that was based, "at least in part, by [claimant's] self-reported symptoms"); **Teague v. Astrue**, 638 F.3d 611, 616 (8th Cir. 2011) (finding no error

in ALJ's decision discounting doctor's report based on claimant's subjective complaints rather than on doctor's own findings).

Additionally, the Court notes that the ALJ did restrict Plaintiff to limited interaction with others and to work involving only simple instructions. These restrictions incorporate some of the limitations described by Dr. Spalding, albeit not to degree he assessed. Dr. Spalding's opinion about Plaintiff's functioning "'does not automatically control, since the record must be evaluated as a whole.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)). The ALJ's evaluation of that record supports his assessment of the weight to be given Dr. Spalding's checklist opinion of Plaintiff's mental functioning abilities.

Credibility Findings.[35] The ALJ, presiding over the hearing from her base in the Seventh Circuit, cited the requirements of 20 C.F.R. §§ 404.1429, 416.929 and Social Security Rulings 96-4p and 96-7p as governing her analysis of Plaintiff's credibility. The Eighth Circuit has held that 20 C.F.R. §§ 404.1529 and 416.929 "largely mirror the *Polaski* factors." **Schultz v. Astrue**, 479 F.3d 979, 983 (8th Cir. 2007). See also **McDade v. Astrue**, 720 F.3d 994, 998 (8th Cir. 2013) (citing Polaski and 20 C.F.R. §§ 404.1529, 416.929 when discussing ALJ's credibility determination); **Dipple v. Astrue**, 601 F.3d 833, 836 (8th Cir. 2010) (same); **Wiese**, 552 F.3d at 733 (citing SSR 96-7p and Polaski when discussing ALJ's

---

[35]Several portions of the following discussion are taken from a discussion of the same issue presented in Brookshire v. Colvin, No. 2:12cv0063 RWS/TCM (E.D. Mo. Aug. 20, 2013). This repetition does not signify any diminution of the Court's consideration of Plaintiff's credibility argument, just as the repetition of the argument from that presented in Brookshire does not signify any diminution of the underlying advocacy.

credibility determination). In the Eighth Circuit, an "'ALJ [is] not required to discuss methodically each Polaski consideration, so long as he acknowledge[s] and examine[s] those considerations before discounting [the claimant's] subjective complaints.'" **McDade**, 720 F.3d at 998 (quoting Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)) (alterations in original). "'Because the ALJ [is] in a better position to evaluate credibility, [the Court] defer[s] to [her] credibility determinations as long as they [are] supported by good reasons and substantial evidence.'" **Id.** (quoting Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006)) (first and fourth alterations in original).

Citing the Seventh Circuit case of **Bjornson v. Astrue**, 671 F.3d 640, 644-45 (7th Cir. 2012), Plaintiff contends that the ALJ's credibility determination must be reversed because it is explained only by boilerplate language. That court held in a later decision that reversal is not necessary if the ALJ has "otherwise explained his conclusion adequately." **Filus v. Astrue**, 694 F.3d 863, 868 (7th Cir. 2012).

Plaintiff quotes the following language in the ALJ's decision as objectionable boilerplate:

> "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible beginning November 26, 2008, to the extent they are inconsistent with the [RFC] assessment for the reasons explained below."

(Pl.'s Br. at 11, quoting R. at 17.) This language, when supported by a consideration of the relevant factors, see page 28, supra, has been cited by the Eighth Circuit when affirming an

ALJ's adverse credibility determination.  See e.g., **Medhaug v. Astrue**, 578 F.3d 805, 814, 816-17 (8th Cir. 2009); **Wiese**, 552 F.3d at 733; **Van Vickle v. Astrue**, 539 F.3d 825, 827-28 (8th Cir. 2008).

"'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (quoting Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)); accord **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011).

Plaintiff contends that the ALJ's credibility determination is not supported by good reasons, including her misunderstanding of his mental illness.  In support of this contention, Plaintiff cites **Watkins v. Astrue**, 414 F. App'x. 894 (8th Cir. 2011), for the proposition that a mentally-ill person's noncompliance with his treatment cannot be used to discredit him.  The claimant in **Watkins** had, as does Plaintiff, bipolar disorder.  **Id.** at 896.  His condition improved when he was on medication and worsened when he was not and when he did not comply with recommendations to return for follow-up visits.  **Id.**  The court noted that it had previously "recognized that a mentally ill claimant's noncompliance can be, and ordinarily is, the result of the mental impairment, and thus it is not deemed willful or unjustifiable." **Id.** (citing Pates-Fires, 563 F.3d at 945-47).  On the other hand, the Eighth Circuit has also recognized that "[i]mpairments that are controllable or amenable to treatment do not support a finding of disability." **Davidson v. Astrue**, 578 F.3d 838, 846 (8th Cir. 2009); accord **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001).

There is no evidence that any failure of Plaintiff to take medication was attributable to his mental illness. Cf. **Pate-Fires**, 564 F.3d at 945-46 (holding that ALJ had erred when finding that medical noncompliance of claimant with bipolar disorder and long history of mental disorders and of numerous hospitalizations for psychotic episodes and who had indicated that she stopped taking her medications because she did not feel like she needed them was not justifiable; evidence "overwhelmingly demonstrate[d]" that "noncompliance was attributable to [claimant's] mental illness"). In May 2002, at least eleven years before his disability onset date, Plaintiff stated that he wanted to see if he could manage his attitude and temper without medications. He did not seek treatment for his temper until two years later. At that time, he needed a letter for his probation officer stating that he was receiving mental health treatment. He did not seek treatment for, nor is there a mention of, any temper or other mental health related issues for the next six years. His reason then for not taking his medications, including his cholesterol-lowering medication, was that he could not afford them. There is no other reference to Plaintiff not taking his medications, nor to him not keeping any appointment with a mental health professional. There is, however, references to him doing better on medication. Thus, contrary to Plaintiff's argument, the ALJ did not find that noncompliance with treatment detracted from Plaintiff's credibility. Rather, Plaintiff was compliant with, and improved with, treatment.

Plaintiff further argues that the ALJ erred by citing the number of times he complained about his blackouts to refute his testimony that he had blackouts four to five times a week. The ALJ cited one complaint, in May 2010; there was another complaint, in June 2004. This

compliant was four years before Plaintiff's amended alleged disability onset date. Thus, the ALJ was correct in noting that Plaintiff had complained only once of blackouts after his alleged disability onset date. Additionally, two complaints to health care providers six years apart is inconsistent with his testimony that he had blackouts four to five times a week.

When evaluating Plaintiff's credibility, the ALJ considered his sporadic work history as detracting from that credibility. This is a proper consideration. See **Pearsall**, 274 F.3d at 1218; **Woolf v. Shalala**, 3 F.3d 1210, 1214 (8th Cir. 1993). Plaintiff argues that his poor work history results from his mental illness and, therefore, confirms his testimony about the severity and effects of that illness. Plaintiff testified, however, about reasons for not working that were unrelated to the symptoms of his mental illness. For instance, he testified that he could not find a job because no one would hire someone with a felony conviction. He testified that he did not like construction work, and had quit one such job, because he did not like to travel.

"Because the ALJ gave good reasons for discounting [Plaintiff's] credibility," the Court will defer to those findings. **Renstrom**, 680 F.3d at 1067.

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome,

or because [the Court] would have decided differently." **Wildman**, 596 F.3d at 964.

Accordingly, for the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  27th  day of August, 2013.